### TOLEDO V. HENRY CONVERSE ET AL.

**1. COMMON LAW DEDICATION—INTENTION TO MAKE.**

In order to constitute a complete and valid common law dedication of land to the public, on the part of the owner, it must appear that he clearly and unequivocally indicated by his words or acts an intention to dedicate. The making of a plat showing a triangular piece of land, at the intersection of streets, and coloring it the same as the streets are colored, and which is without lot number, but which is not within the demensions of streets as shown by said plat, and the fact that for many years no taxes or assessments were paid (none being demanded) on said triangular piece of land, are not sufficient to indicate conclusively or unequivocally an intention to dedicate.

**2. EVIDENCE OF PURPOSE TO REJECT INTENDED DEDICATION.**

And where the city, having taken no formal action in accepting the property above referred to, subsequently accepts dedication of streets and alleys shown on said plat, and in the improvement of streets excludes the triangle from the improvement, and subsequently, for improvement of a street upon which it abuts (said property having been omitted inadvertently from taxation or assessment for many years) makes an assessment for such improvement, this is evidence not only of a purpose not to accept, but of a purpose to reject such property if a dedication was intended.

**3. FAILURE TO ESTABLISH ADVERSE USE AND OCCUPATION.**

Where the city in making street and sidewalk improvements clearly located such improvements and in such a way as to exclude, and indicate an intention to exclude, the property referred to, the fact that persons may have driven outside the lines of the street and upon the property in question, or that pedestrians, under similar conditions, have gone over said property, for a number of years, does not constitute adverse use and occupation such as will defeat the title of the owners or constitute acceptance if a common law dedication was intended.

**4. FAILURE TO PAY TAXES DOES NOT CREATE ESTOPPEL.**

Property owners are not estopped from claiming ownership of such land by having omitted to pay taxes or assessments thereon for a long period of time where no taxes or assessments were demanded. Property owners are not required to hunt up city authorities and seek to pay or tender payment of taxes or assessments in order to escape estoppel against ownership.

APPEAL.

*M. R. Brailey*, City Solicitor, for the plaintiff.

*Hamilton & Kirby* and *R. S. Holbrook*, for the defendants.

PARKER, J.

This case is here on appeal. It was submitted to Judge Hull and myself, Judge Haynes declining to sit in the case because of some interest he had had, years ago, as a lawyer, in a controversy respecting some of the lines of the property in question. This action is brought by the city of Toledo against Converse and others to restrain them from exca-

vating on a certain triangular piece of land' lying between what was Smith street, now Empire street, and Adams street, in the city of Toledo, which the defendants claim to own and which the city claims was formally dedicated to and accepted by the city for street purposes. On the trial of the case certain facts were admitted, and the following is a statement of a part of those facts:

"It is admitted by and between the plaintiff and the defendants herein that there is a regular chain of title from the general government down to Francis J. King and Charles B. Philipps, and that the title to the premises here involved was in the said Francis J. King and Charles B. Philipps and that under the legal title thereto, on September 17, 1855, a plat thereof was made and signed which was recorded in 1855. It is conceded by the defendants that on September 17, 1855, Francis J. King and Charles B. Philipps signed a certain plat of certain property in the city of Toledo, including the premises herein, recorded in vol. 2 of plats, on page 31, wherein said King and Philipps platted certain premises and therein dedicated to public use certain streets and alleys. It is admitted that the statements made by A. E. Wilson in his abstract, as to the existence or non-existence of ordinances, is what said Wilson would swear to if he were sworn and testified as a witness, and it is agreed that said abstract shall have the same force and effect as the testimony of said Wilson if he were sworn and testified to the same. It is admitted by all parties hereto that since the dedication of said property, or rather since the signing of the plat by Francis J. King and Charles B. Philipps, that no taxes have been paid by said Philipps and King, or any parties claiming to own under them, on this property in question. It is also admitted that neither Philipps nor King, nor any parties claiming under them, have paid for any of the improvements made around said premises, on either Adams street or Vermont avenue or Empire street—formally Smith street; it is admitted that no general taxes or special assessments have been paid on this property, and that improvements have been made from time to time; that Adams street has been paved twice in the meantime and Vermont avenue has been paved and sidewalks have been built on Vermont avenue, Adams street and Empire street by the city of Toledo. It is admitted that in 1879, an assessment was confirmed for paving Adams street with cedar blocks, said pavement passing the premises in question, and that no special assessment was made against the property in question; that the same was confirmed August 29, 1879. It is also admitted that there was an assessment for the Adams street pavement confirmed in October, 1879, the present stone paving, which pavement passed the premises in question, which assessment is found in vol. 1 of paving assessments, page 192 of the city records and that an assessment of $69.56 was levied against the premises in question, but that the same has never been paid—June 1, 1891. It is admitted that no claim for damages for the opening of Vermont avenue was ever filed with the city of Toledo."

There are some other admissions to which I may make reference, farther along.

The tract of land in controversy consists of an irregular piece 13.52 feet on Adams street, 24.52 feet on Vermont avenue, 32.76 feet on Empire street, and having a length of 38.64 feet at its base, that being the line between the tract in controversy and lot 21 of Philipps' addition to the city of Toledo. When this plat which has been referred to was prepared and filed for record, in 1855, Vermont avenue had not been opened,

and therefore these lines on Smith street or Empire street, and Adams street, were extended until they came together, so that the whole track lying to the westerly of lot 21 was of a triangular form.

From the plat introduced it appears that the tract consisted of about ten acres which was divided into lots, streets and alleys, one of the streets being an extension of Adams street and one being Smith street. The plat sets forth that the streets, other than Adams street, have a width of sixty feet. This would include Smith street, and on that street is marked a width of sixty feet. This triangular piece, however, was colored upon the map the same as the streets; it was not numbered as a tract or lot, but the lots which were numbered lying immediately adjacent to it, and running towards the east, begin with lot 21 and then follows 20, and so on.

It is conceded in argument that the only positive or affirmative act on the part of the persons who laid out this tract and dedicated the streets and alleys, indicating a purpose to dedicate this triangular piece as a part of the streets, was this act of making out the plat in this form, with this coloring of the triangular part in question the same as the street. This, it will be observed, is not at all consistent with the width of the street as given upon the map, though it is said that in cases of that kind the indication given by the coloring of the map would control the width of the street, especially since no numbering as a lot is given to the triangular piece.

It is conceded that the council of the city has never, by any resolution or ordinance, accepted this whole plat or the streets as dedicated. Some seven years, I think, after the plat had been recorded, the council, by resolution or ordinance, accepted such part as had been dedicated for streets and alleys lying to the south of Adams street, perhaps to the south of the north line of Adams street, but there has been no farther acceptance by any positive act of the council. The plat covers territory both to the north and south of Adams street and this triangular point is north of Adams street and there has never been any positive action, by way of ordinance or resolution, accepting the proposed dedication of streets and alleys north of Adams street.

But it is contended on behalf of the city that the purpose of the original proprietors to dedicate this for street purposes is clear; that though the city had not accepted it by such formal action, it has occupied and used it in such a way as to amount to an acceptance that would be binding upon both the city and the proprietors; that the city has occupied it adversely for a period of twenty-one years, which would give the city a title; and (I don't know as that should be stated as a separate claim), in connection with this common law dedication, it is said that the original proprietors should now be estopped from claiming this triangular point or any part of it because of what has been done as stated, and because of taxes and assessments not being levied upon it or required of the proprietors, either for general revenue or because of improvements made along the line of the property in question.

It is conceded that the defendants have all the title of the original proprietor.

It seems to us that the evidence of intent to dedicate it is not quite clear. I have mentioned that the width of the street is given as sixty feet, and the width of Adams street as sixty-six feet; and that would leave just such a triangular point of land not within either street that is not a part of either or both streets.

Toledo v. Converse.

A case has been brought to our attention since the argument of this case, that in many respects in its facts is like it. I refer to Steinauer v. Tell City, 146 Indiana Sup. Ct. Rep., 490. I shall not read from this to any great extent, for I assume that counsel here are reasonably familiar with the authorities handed up. In that case the controversy was about a triangular tract of land left between two streets and upon the subject of the evidence of the purpose or intent to dedicate, the court has this to say:

"In order to constitute a complete and valid dedication of la d to the public, it must be shown that the owner of the land clearly and unequivocally indicated by his words or acts to dedicate the same, and ere must also be an acceptance thereof by the public."

The words "an intent" are necessary to complete the sense his syllabus, but it so appears in the body of the opinion. On page the court say:

"Under all the circumstances, we do not think this is suffi to reasonably raise the presumption the society intended to dedicate it to the public. There is no express finding by the court showing th the society intended to dedicate this ground to any purpose. Evidentiary facts tending to prove an intended dedication, or from which the same might possibly be presumed, are not of themselves such intended dedication."

There is something more in the opinion upon the subject of acceptance of a dedication, to which I may refer farther along. But assuming that a purpose to dedicate should be found and is sufficiently clear and unequivocal, let us look for a moment to the evidence as to the acceptance. It seems to us that it cannot be said fairly that there is such evidence of acceptance by occupation and use on the part of the city as would perfect a dedication and shift the responsibility for the proper care of this piece of land on to the city, and relieve the original proprietors or their grantees therefrom. The statute requiring that there should be an acceptance of a dedication is for the protection of the city, as is held in Wisby v. Bonte, 19 Ohio St., 238: from which I quote.

"Section 63 of the municipal corporation act is not intended as a limitation upon the general powers of the corporation for opening and improving streets, but as a restriction to prevent proprietors, who may lay out grounds into lots within the limits of the corporation, from vesting in the corporation the title to streets and alleys, and thus charging the corporation, without its consent, with the duty of keeping them open and in repair."

Of course, that is a very important matter to a city, because if the property which the proprietor undertakes to dedicate for a street or alley is not kept in proper condition of repair, a traveller may be injured and the city may be required to respond in damages. The topography of this piece of land appears to have been rough and uneven; it lay from three to five feet above the level of the streets upon either side of it, somewhat higher above Empire street (formerly Smith street) than it was above Adams street, because Empire street descended rapidly from Adams street; and this ground was uneven and had hills and hollows in it. Now, if the city had leveled that and made it conform to the streets, and had paved it, as it afterwards did with respect to a part of it, that part which was afterwards taken for Vermont avenue, we have not much question but the proprietors would now be precluded from reclaiming it, if not because of an evident purpose to dedicate it, at least

because of their standing by and allowing it to be used in such a way as to estop them from now undertaking to reclaim it. But the city seems to have run the line of the curbing upon Adams street out to a point, leaving room for the sidewalk between the tract of land and the curbing, the curbing extending along Adams street until it met with the curbing extending along the south side of Empire street. The paving and curbing upon Adams street was done some years earlier than the paving upon Empire street, but in both instances the city proceeded in this way: it not only set the curbing there, but it laid the sidewalks on either side of this point of land between the lot and the curb. Now this indicated very plainly the purpose of the city to exclude this triangular tract from both streets, and to not bring it into either street.

But the city might accept it and use it for street purposes though it did not pave it, and although there was no flagging laid upon it for sidewalks. It might use it as a little triangular park, along the side of the street, lying between these two streets. And it is said that this was done.

According to the evidence, as we understand it, along about 1884, some of the proprietors of lots near to this point of land, desiring to have it fixed up and improved, because it was unsightly, and in order to add to the attractiveness of their own property, or so that their own property might not be detracted from in consequence of this unsightly piece lying near by, made up a subscription and gave $5.00 or more or less, each, toward a fund that they used in levelling off, grading and perhaps sodding this piece of land and they made some appeal to certain of the members of the board of park trustees and received some assistance from that quarter; how much is not clear; it does not appear to have been a great deal, but sufficient to plant some flowers and make provision for watering them and the lawn; but there does not appear to have been any formal action in the premises, even on the part of the park board, and we are not prepared to say that the individual members of the park board, acting alone, as it seems they did in this case, could have so bound the city by such conduct as that in the event of an accident happening to some one going over this tract of land, the city would have been responsible for its not having been kept in proper condition. A part of this improvement was the putting of an iron fence around the tract. Some four years later, if I have the time correctly in mind, Vermont avenue was laid out, and it ran north and south, cutting off the extreme point and leaving the base of the triangular part as I have described it. And here again the city indicated its purpose as to the quantity of this tract that it would take and use for street purposes, by establishing the curb for Vermont avenue.

Theretofore the city had not levied any assessment upon any part of this point of land for any of these street improvements, nor had the point of land been upon the tax duplicate for taxation. That seems to have been in consequence of the authorities losing sight of it, as the proprietors seem to have done. It was not very valuable at the time it was laid off, and, in consequence of this map being in the condition that I have described, both the proprietors and the public taxing authorities seem to have lost track of it; but when Vermont avenue was laid out, the city seem to have discovered that here was a tract of land that they did not care to take into Vermont avenue. The city did not undertake to assume control of it or declare ownership of it, but proceeded to assess

a part of the cost of the Vermont avenue improvement upon this particular disputed tract of land.

Now that, we think, was such an unequivocal declaration of the purposes of the city of Toledo to not accept or claim the tract as that we must give the action its legitimate effect as evidence.

It is said in argument, that this was done through mistake on the part of the city authorities; but there is no evidence to that effect adduced; it was done, and we do not feel authorized to guess or assume that it was done by mistake. That, to our mind, is evidence of the purpose of the city, not only not to accept the dedication of this part of the triangular piece, but to distinctly declare its purpose to reject any attempted dedication.

It is said that the proprietors are to be regarded as estopped because they have not paid the assessments on account of the paving and the laying of the sidewalks upon Adams street and Empire street, but we do not understand that the circumstances were such as to give rise to an estoppel. They were not asked to pay anything. If there had been any assessment levied upon this lot and they had then declined to pay, upon the ground that they were not the owners, and had dedicated it to public use, if anything of that kind had occurred, of course it would have presented quite a different case; but here the authorities seem to have lost track of it and made no assessment upon it, and we are of the opinion that it was not necessary, to escape the effect of estoppel, for the proprietors to hunt up the city authorities and say to them, "We own a piece of property here and there has been an improvement made alongside of it and we think we ought to pay something on account of it, and therefore we make a tender of what we think is justly and fairly due to the city on account of that improvement." We do not think anything like that was necessary.

Some testimony tended to show that this point has been driven over and that foot passengers had gone over it for a number of years, and the city contends that such use not only indicated an acceptance for street purposes by the public, but that it amounted to such an adverse occupation and use as to have cut off the title of the original proprietors.

In view of what the city had done in locating the streets and setting the curbs, as I have described, we do not think that the fact that persons may have driven outside of the lines of the street onto this property amounts to such conduct on the part of the public, with the knowledge and approval of the authorities, as would bind the city so that it should be said that the city had accepted the dedication, as a common law dedication. There does not appear to have been a great deal of driving across this point; there is some dispute upon that subject, but as to where this driving occurred it appears to us quite clear from the testimony of Mr. Lyman that there was no driving or walking across this particular part of the triangle now in controversy at the times mentioned by the witnesses who testify to some walking or driving across some part of the triangle, because it stands undisputed that about 1867 or 1868, he constructed a house upon what he supposed to be the east line of his lot, he being the owner of lot No. 21; that about the time he built the house he also undertook to fence in lot No. 21, his lot being sixty-six feet wide on Adams street he extended this fence to the western line of his lot sixty-six feet. Then he crossed over to Empire street with his fence and extended the fence on Empire street along what he supposed to be the north line of his lot, and that fence stood

at the point where he located it until perhaps 1884, or later, when it was taken down or disappeared. But the fence stood there during the period of time covered by the travelling over this point as testified to by the witnesses. After this fence was taken down an iron fence was put up and there was no travel over any part of the point after that. It is made clear by the evidence adduced here that that fence extended to the westward about twenty feet too far, that he had made a mistake in the location of his lot and that his lines were about twenty feet to the eastward of where he supposed them to be, and where they are marked and established on the ground now. So that the fence enclosed substantially all of this particular part of the triangle, the title to which is now in dispute, and the driving and walking across the triangle could not have been across the part of the triangle with reference to which we have this controversy, and therefore no effect can be given to the testimony upon the subject of walking and driving across the point.

I believe I have covered substantially all the points necessary to mention in the case. We are not satisfied that there was an intention to dedicate this particular triangle; but, assuming that there was such an intent, there has not been an acceptance of such intended dedication by the city. There is no estoppel, and there has been no adverse use or occupation for a period sufficient to give title under the statute of limitations. What was true as to the triangular point in the case of Steinauer v. Tell City, *supra*, is true of this, and I read from that case:

" This strip has not been in any way improved as a street, neither has it been travelled nor used to any extent, as the finding discloses. There being an absence of use sufficient to constitute an acceptance, there must be proof of an acceptance on the part of the public authorities of Tell City by some formal act of theirs, showing an unmistakable intention to accept the land dedicated, and for the purposes for which it was intended by the dedicator to be used, etc." Citing People v. Underhill, 144 N. Y., 316.

It is not necessary to say that the city cannot hold this part of the triangle for any other purposes than for street purposes, and what I have said makes it unnecessary to discuss whether or not the purposes for which they propose to improve it would amount to a holding of it for street purposes. The finding and decree will be for the defendants and they will be quieted in their title and the costs will be adjudged against the city and the injunction will be dissolved.